1  SAMUEL J. WELLS, ESQ. (State Bar No. 48851)
   Samuel J. Wells, A Professional Corporation
2  11661 San Vicente Boulevard, Suite 500
   Los Angeles, California  90049-5113
3  (310) 207-4456; FAX (310) 207-5006
   *thefirm@swellslaw.com*
4
   Attorney for Plaintiffs
5

6

7

8
                UNITED STATES DISTRICT COURT FOR THE
9
             CENTRAL DISTRICT OF THE STATE OF CALIFORNIA
10

11  RAFAEL RISHIK                    )    CASE NUMBER
    KEITH GREEN                      )    CV 09-0359 AG (SSx)
12  STEPHEN J. ERDODY, and all       )
    others similarly situated,       )    MEMORANDUM OF POINTS
13                                   )    AND AUTHORITIES IN
                         Plaintiffs, )    OPPOSITION TO
14                                   )    DEFENDANT AMERICAN
    v.                               )    FEDERATION OF
15                                   )    MUSICIANS OF THE UNITED
    AMERICAN FEDERATION OF           )    STATES AND CANADA'S
16  MUSICIANS OF THE UNITED          )    SECOND MOTION TO
    STATES AND CANADA                )    DISMISS
17                                   )
                         Defendants. )    DATE:   November 9, 2009
18                                   )    TIME:   10:00 A.M.
                                     )    BEFORE UNITED STATES
19  _____  )    DISTRICT JUDGE GUILFORD

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

1.   INTRODUCTION AND BACKGROUND ...................... 1

2.   ARGUMENT ........................................... 2

   A.   Bylaws Section 32(f) Was Not Ratified by Direct Membership
        Vote, in Violation of LMRDA Section 101(a)(3)(A). ......... 2

   B.   The Convention Ratified § 32(f) Without an Informed Vote . 10

   C.   Arbitrary Enforcement of Section 32(f) Is Unlawful ........ 14

   D.   Insofar as it Operates Retroactively, Bylaws § 32(f) Is a Void
        and Unenforceable Retroactive Dues Assessment .......... 15

   E.   Defendant has completely ignored the Fourth Claim
        for Relief ............................................ 19

   F.   The Union Breached its Duty of Fair Representation and
        Violated Section 101(a)(3) by Steamrolling Over the Rights of a
        Minority Group of Members to Create a Predatory and
        Discriminatory Dues Provision ......................... 21

3.   CONCLUSION ........................................ 24

1

# TABLE OF AUTHORITIES

2

## STATE CASES

3 *Joinette v. Local 20, HMREB Union,*

4     106 Wash. 355, 722 P2d 83 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

5

## FEDERAL CASES

6 *Ackley v. Western Conference of Teamsters,*

7     958 F.2d 1463 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

8 *American Federation of Musicians v. Wittstein,*

9     379 U.S. 171 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 14

10 *Ashcroft v. Iqbal,*

11     --- U.S. ----, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009) . . . . . . . . . . . . 1

12 *Bowen v. Georgetown University Hospital,*

13     488 U.S. 204 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

14 *Breininger v. Sheet Metal Workers Int'l. Ass'n.,* 493 U.S. 67 (1989) . . . 21, 24

15 *Brown v. IBEW Local 58,*

16     936 F.2d 251 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

17 *Bunz v. Motion Picture Machine Operators,*

18     567 F.2d 1117 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

19 *Burroughs v. Operating Engineers Local Union No. 3,*

20     686 F.2d 723 (9th Cir. (1982) . . . . . . . . . . . . . . . . . . . . 4, 5, 9, 10, 14

21 *Denov v. Chicago Federation of Musicians, Local 10-208,*

22     703 F.2d 1034 (7th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . 4, 5, 10, 14

23 *Gadda v. State Bar,* 511 F.3d 933 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . 21

24 *Hall v. Cole,* 412 U.S. 1 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 18

25 *Landgraf v. USI Film Products,* 511 U.S. 244 (1994) . . . . . . . . . . . 15, 16, 18

26 *Lewis v. Tuscan Dairy Farms, Inc.,* 25 F.3d 1138 (2d Cir. 1994) . . . . . . . . 21

27 *Local No. 2, Telephone Workers v. International Bhd. of Tel. Workers,*

28     362 F.2d 891 (1st Cir. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Mori v. International Brotherhood of Boilermakers, Iron Ship Builders,*

*Blacksmiths, Forgers and Helpers Local Lodge No. 6*, 653 F.2d 1279 (9th Cir.

1981), *cert. denied,* 454 U.S. 1147 (1982) . . . . . . . . . . . . . . 4, 5, 6, 7, 9, 10, 14

*Patterson v. United Brotherhood of Carpenters & Joiners of America,*

*AFL-CIO,* 906 F.2d 510 (10th Cir. 1990) . . . . . . . . . . . . . . . . . 5, 6, 7, 8, 9, 10

*Polone v. Commissioner,* 505 F.3d 966 (9th Cir. 2007) . . . . . . . . . . . . . 17, 18

*Rota v. Brotherhood of Ry., Airline and S. S. Clerks,*

      489 F.2d 998 (7th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5

*Sertic v. Cuyahoga, Lake, Geauga and Ashtabula Counties Carpenters Dist.*

*Council of United Broth. of Carpenters and Joiners of America,*

      423 F.2d 515 (6th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 10

*Stevens v. Northwest Indiana Dist. Council, United Broth. of Carpenters,*

      20 F.3d 720 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Trail v. Teamsters,*

      542 F.2d 961 (6th Cir. 1976), *overruled on other grounds* . . . . . . . . . . 22

*United Steelworkers of America, AFL-CIO-CLC v. Sadlowski,*

      457 U.S. 102 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Vaca v. Sipes,* 386 U.S. 171 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*White v. Local 207,*

      387 F. Supp. 53 (W.D. La. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Wirtz v. Local 153, Glass Bottle Blowers Association,*

      389 U.S. 463 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Wooddell v. International Bhd. of Elec. Workers, Local 71,*

      502 U.S. 93 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## STATUTES

LMRDA, Section 101(a)(3), 29 U.S.C. § 411(a)(3) . . . . . . . . . . 3, 4, 5, 6, 7, 10, 11

29 U.S.C. § 412 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

29 U.S.C. § 481 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

29 U.S.C. § 482 ................................................... 3

TREATISES

M. MALIN, INDIVIDUAL RIGHTS WITHIN THE UNION (1988) ............... 5, 17

ARTICLES

Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons about How Statutes are to be Construed,*

    3 VAND. L. REV. 395 (1950) ................................... 14

1              ## MEMORANDUM OF POINTS AND AUTHORITIES[1]

2   ## I.  INTRODUCTION AND BACKGROUND

3          Plaintiffs were granted leave to file an amended complaint on or before

4   August 17, 2009, without law-of-the-case prejudice to the Court's review of

5   dismissed claims as restated in the amended complaint.  Plaintiffs timely filed

6   their First Amended Complaint, to comply with *Ashcroft v. Iqbal* --- U.S. ----,

7   129 S. Ct. 1937, 173 L. Ed.2d 868 (2009).  Dkt. # 35. The amended complaint

8   ("AC") alleges material facts in detail and adds some claims.

9          This lawsuit arose from AFM's adoption at its 2007 convention,

10  effective September 15, 2007, of Bylaws § 32(f), creating a 2% dues upon

11  annual gross distributions to musicians from supplemental market funds

12  ("SMFs") under collective bargaining agreements covering electronic media

13  work.  Only two such funds generate such payments: the Sound Recording

14  Labor Agreement's Special Payments Fund and the Film Musicians SMF.

15  Fund payments are devisable benefits that may be bequeathed.  AC ¶ 24.

16         The Bylaws define "work dues" as "[d]ues based on scale earnings for

17  all musical services performed under AFM-negotiated agreements ...." Dkt. #

18  43-7, at 49 - Bylaws art. 9, ¶ 32.  "Scale" is t"[h]e applicable minimum that

19  AFM members may accept for an engagement, as designated in a CBA

20  covering the engagement, ...." *Id.* 94.  The SRLA expressly excluded SMF

21  payments from classification as scale earnings, incorporated the Bylaws, and

22  declared ineffective any Bylaws amendments during the term of the SRLA that

23  would "contravene" SRLA terms. Dkt. 43-2, § 13, at 5. It also barred

24  construction of the SRLA as interfering with members' obligations to the

25  Union. *Id.,* § 12(b), at 4.

26         At the 2007 convention, AFM asked delegates to ratify § 32(f), a new

27  "work dues" on SMF payments, payable entirely to AFM and subject to an

28  _____

[1]  Plaintiffs incorporate herein the statement of facts in their amended
memorandum in opposition to the AFM's first motion to dismiss.

1   exemption for annual earnings of less than $2,500.  AC ¶¶ 28, 29.  Between

2   1,200 and 1,500 members are believed to be subject to this dues, less than 2%

3   of the 2007 86,642 active and life members.  AC ¶¶ 38, 43. The three local

4   unions where most of these members are found were already carrying 92% of

5   all local union dues, fees, and per capita.  AC ¶ 65.  Section 32(f) was ratified

6   by 50,552 in favor and 37,401 opposed, a total vote of 87,953 – exceeding the

7   voting membership by 1,311.  AC ¶¶ 71, 72.  Section 32(f) was voted down

8   by a margin of 17:1 in the five local unions where assessed members were

9   concentrated.  AC ¶¶ 73-76.  Convention delegates were misinformed or not

10  informed of many material facts.  AC ¶¶ 44-65.

11      Section 32(f) does not on its face state a retroactive effect, but the AFM

12  in September 2008, assessed it against the entire year's distribution, including

13  the portions reflecting earnings back to 2003, of members working under the

14  SRLA, on threat of fine, suspension, or expulsion.  It did not assess agency

15  fee payers or retirees who continue to receive SMF payments, and it asked

16  members under the Film Industry Agreement to estimate their dues obligation

17  on the honor system, no questions asked.  AC ¶¶ 95, 99, 100-102.

## II.  ARGUMENT[2]

*A. **Bylaws Section 32(f) Was Not Ratified by Direct Membership Vote, in Violation of LMRDA Section 101(a)(3)(A).**[3]*

The LMRDA singles out two expressions of union power as expressly requiring approval by membership vote:  the powers to select union officers, 29

_____

[2]  For two reasons, the "law of the case" doctrine does not govern here: first, because new material facts and claims are pleaded in the amended complaint, and second, because the Court expressly granted plaintiffs' request at the hearing to present again, without prejudice, the arguments presented in their corrected brief in opposition to the first motion to dismiss.

[3]  Parts A, B, C, and most of D were not previously considered by the Court

-2-

1    U.S.C. §§ 481, 482, and impose dues, 29 U.S.C. § 411(a)(3).  The Union's
2    power to tax dues is one of the "specific areas in which Congress has found
3    that the interests of individual members need special protection against the
4    danger of overreaching by entrenched union leadership." *Rota v. Brotherhood*
5    *of Ry., Airline and S. S. Clerks*, 489 F.2d 998, 1003 (7th Cir. 1973) (Stevens, J;
6    Justice Clark, sitting by designation; and Castle, J); *American Federation of*
7    *Musicians v. Wittstein,* 379 U.S. 171, 181 (1964).[4]

8          "Congress modeled Title I after the Bill of Rights," *United Steelworkers*
9    *of America, AFL-CIO-CLC v. Sadlowski,*457 U.S. 102, 111 (1982).  Rights
10   created by § 101(a)(3) are both procedural and substantive.  Procedurally, local
11   unions must submit proposed increases to a direct membership secret ballot
12   vote, at a noticed meeting or by referendum, § 101(a)(3)(A), while an
13   international union has three options: a vote by delegates to convention, a
14   secret ballot membership referendum vote, or an executive board vote that is
15   binding only until the next convention, section 101(a)(3)(B).  The procedural
16   provisions of section 101(a)(3) must be fair.  *Rota, supra,* 489 F.2d at 1004.

17         Section 101(a)(3) also creates substantive rights:

18       Section 101(a)(3), although perhaps more procedural in nature
19       than some of its Title I counterparts, also confers personal rights
20       on union members....

21       [Section] 101(a)(3)'s overall scheme [is] to protect union members'
22       interest in stable dues levels. That a procedure laid out in a union
23       constitution is in one narrow and limited circumstance adequate to
24       safeguard union members' dues-related rights does not alter §
25       101(a)(3)'s essential character as a bestower of such rights.  Like

---

27       [4]    Whether other exercises of union power are subject to voting is left
28   to individual unions, subject only to the "equal voting rights" limitation of 28
U.S.C. § 411(a)(1).

-3-

1    an action under its Title I brethren, §§ 101(a)(1) & (2), a §

2    101(a)(3) claim is in the nature of a civil rights action.

3  *Stevens v. Northwest Indiana Dist. Council, United Broth. of Carpenters*, 20

4  F.3d 720, 727, 728 (7th Cir. 1994) (footnotes omitted).

5    The Ninth Circuit has emphasized section 101(a)(3)'s purpose:

6    The clear purpose of section 101(a)(3) ... is to curb the potential

7    for autocratic and unrepresentative rule of union officers, by

8    preventing the leadership of a union from imposing arbitrary

9    financial exactions unilaterally on its membership. Section

10   101(a)(3) was designed to vest control over increases in rates of

11   dues in the union members, not the union management.

12 *Burroughs v. Operating Engineers Local Union No. 3,* 686 F.2d 723, 728 (9th

13 Cir. (1982) (citing *Mori, infra,* among other precedents).

14   Substantive rights under § 101(a)(3) include:

15   a)   A bar against arbitrary dues increases, *Wittstein, supra,* 379 U.S. at

16 180; *Burroughs, supra; Denov, infra,* 703 F.2d at 1040.

17   b)   "[A]n implicit fairness-of-representation requirement" applicable to a

18 dues increase ratified by a union convention. *Denov v. Chicago Federation of*

19 *Musicians, Local 10-208,* 703 F.2d 1034, 1038-39 (7th Cir. 1983);

20   c)   A "meaningful" vote, whether by delegates at a convention or direct

21 secret-ballot referendum. *Sertic v. Cuyahoga, Lake, Geauga and Ashtabula*

22 *Counties Carpenters Dist. Council of United Broth. of Carpenters and Joiners*

23 *of America,* 423 F.2d 515, 521 (6th Cir. 1970).

24   d)   An "informed vote," as an aspect of the meaningful vote required

25 by§ 101(a)(3).   *Denov, supra.*

26   e)   A ban against retroactive dues increases. "The courts are

27 unanimous in condemning union efforts to give votes retroactive effect."   M.

28

-4-

1  MALIN, INDIVIDUAL RIGHTS WITHIN THE UNION 89 and nn. 243-245 (1988)

2  (collecting cases); *Local No. 2, Telephone Workers v. International Bhd. of Tel.*

3  *Workers,* 362 F.2d 891, 896 (1st Cir. 1966).

4        f)    A rule against "exploitative or discriminatory" dues increases

5  imposed by the international union upon a minority group within the

6  membership.  *Compare, Patterson v. United Brotherhood of Carpenters &*

7  *Joiners of America, AFL-CIO,* 906 F.2d 510, 514 (10th Cir. 1990), *with Mori v.*

8  *International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths,*

9  *Forgers and Helpers Local Lodge No. 6*, 653 F.2d 1279, 1284-85 (9th Cir.

10  1981), *cert. denied,* 454 U.S. 1147 (1982).[5]

11        The burden of proof under § 101(a)(3) is the union's – not the plaintiff's

12  – "to demonstrate unambiguously that the statutory requirement has been met."

13  *Rota, supra,* 489 F.2d at 1004.[6]  In *Rota,* the plaintiffs, on the basis of personal

14  observation unsupported by a contemporaneous recorded numerical count,

15  challenged the union's conclusion, also based on personal observation, that 2/3s

16  of delegates present at a convention had stood in favor of the proposed dues

17  increase.  The union failed to carry the burden that *it* bore under section

18

19

20

21        [5]  In its tentative order, at 7-8, the Court relied solely on a treatise in
22  concluding that section 101(a)(3) imposes only procedural, and no substantive
     requirements on dues increases.  We respectfully draw the Court's attention to
23  *Patterson, Mori, Burroughs, Stevens, Sertic,* and *Denov, supra*, representing
     holdings from the 6th, 7th, and 10th Circuit Courts, that section 101(a)(3)
24  establishes both substantive and procedural requirements.

25        [6]  "Since Congress has deemed the subject of dues increases sufficiently
26  important to require statutory controls, it is also sufficiently important to
     require the union to demonstrate unambiguously that the statutory requirement
27  has been met."  *Id.*

28

101(a)(3), despite its status as the defendant, to show that the dues had been approved by a majority vote.

Section 101(a)(3) did not displace traditional parent union authority to raise the dues of members of affiliated local unions. An *across-the-board* dues increase imposed by convention and affecting all local union members equally is not unlawful if it is ratified in accordance with section 101(a)(3)(B). On the other hand, "an attempt by an international union to impose increased dues on only a minority of its membership requires more careful scrutiny," *Patterson, supra,* at 514 (10th Cir. 1990).

Such a scenario was presented in *Mori, supra,* in which the increase affected only a small division of construction workers in a union encompassing other trades and job classifications. The court upheld the increase, even though it was imposed by convention rather than by local union vote in the locals where the members to be assessed were located, because it was done democratically, to assist a needy division. No evidence suggested a risk of violating Congress' intent in section 101(a)(3) to protect members "from arbitrary, exploitative or discriminatory action by the international union." 653 F.2d at 1284-85. The court emphasized the facts of the case:  The dues applied uniformly to all construction division members throughout the country; the increase was actually supported by them; and income to be generated by the increase was to be earmarked for the construction trade. "Although the dues increase at issue here affects only construction workers, no evidence in the record suggests that this disparity will work to the advantage of other members of the International," at the expense of construction workers.  653 F.2d at 1285.

*Mori* represents the farthest limit tolerated by any court in allowing a convention to ratify a dues increase not assessed against all members.  A later case held that *Mori* does not permit a convention to approve a dues increase

1  affecting the members of one local union, without being earmarked for their

2  benefit and where the members of the affected local union had rejected the

3  increase.  On those facts, the increase was required to be ratified under section

4  101(a)(3)(A), by direct secret ballot vote of the members of the affected local

5  union.  *Patterson, supra,* at 514.  "A holding that a district convention could

6  set local dues for one single local union would be to completely sterilize the

7  provisions of § 101(a)(3)(A)."  *White v. Local 207,* 387 F. Supp. 53, 56 (W.D.

8  La. 1974).  In *Patterson,* the parent union exceeded its authority by seeking "to

9  impose a dues increase on a minority of its membership that had repeatedly

10  rejected just such an increase through democratic votes."  *Id.,* 514.  The court

11  in *Patterson* distinguished the facts of the case before it from the facts of the

12  case in *Mori* and declined to follow *Mori.*

13      In this circuit, then, section 101(a)(3) permits dues affecting a specific

14  class of the membership to be ratified by a convention representing the entire

15  membership, at least where (a) the members of the class to be assessed are

16  scattered throughout the country and affiliated local unions, (b) the members to

17  be assessed approved the new dues, and (c) the revenue to be generated by the

18  new dues is earmarked for the benefit of the class to be assessed.

19      The instant case falls between *Mori* and *Patterson.*  Plaintiffs were not

20  denied representation at the convention, though their representation there had

21  little meaning, given its voting power of a mere 1.7 percent of the membership.

22  In other respects, this case, like *Patterson,* involves an egregious abuse of

23  union power, and should be controlled by *Patterson* under the explicit rationale

24  of *Mori.*  The facts pleaded in the amended complaint require close judicial

25  scrutiny and the more democratic secret ballot direct membership vote required

26  by section 101(a)(3)(A):

27

28

-7-

1          a.  In this case, more egregiously than in *Patterson*, the members to be
2    assessed under the new dues comprised a carefully constructed group: members
3    who worked under a seemingly neutral class of CBAs, of which there were a
4    grand total of two.  The group was further refined to exclude the overwhelming
5    number of group members, by exempting entirely all those earning less than
6    $2,500 annually in fund benefits.  Further, AFM assessed the dues only against
7    members working under one of the two CBAs (the SRLA), on threat of
8    discipline for noncompliance, while offering members working under the other
9    CBA the option to estimate their dues obligation, on the honor system, without
10   fear of challenge.

11         The dues in this case would be akin to convention ratification by a
12   faculty union of dues to be assessed only against law and medical school
13   faculties, on the theory that they are the highest paid members and should
14   "carry the load" for the rest of the membership – the rationale expressed at the
15   2007 convention for ratification of § 32(f).

16         b.  The pleadings show a history of conflict between the assessed
17   minority membership group and the international union leadership, including a
18   past disaffiliation and a predecessor provision of this same dues.  Political
19   retaliation was implicit in § 32(f), which doubled the 1% rate previously
20   imposed, and uncapped it, as well, coinciding with the candidacy of an RMA
21   challenger to AFM leadership at that same 2007 convention.  AFM leadership
22   at the convention goaded delegates to ratify the new dues by attacking RMA
23   members as greedy, selfish, and unduly wealthy, although their local unions
24   were already loyally carrying on their backs 92% of the entire membership's
25   dues burden.  Would any court find it lawful for a *convention* to ratify a dues
26   increase imposing 100% of the dues burden on a small membership group?

27

28

1        Membership groups singled out for discriminatory and exploitative dues
2    may of course exercise the option to disaffiliate, after paying the discriminatory
3    dues for a period of time. But the LMRDA was enacted for the purpose of
4    protecting union members from just such abuses of official union power. *Wirtz*
5    *v. Local 153, Glass Bottle Blowers Association,* 389 U.S. 463, 469-70 and n.9
6    (1968); *Hall v. Cole*, 412 U.S. 1, 7-8 (1973); *Burroughs, supra,* 686 F.2d at
7    728. The potential for abuse of official power is self-evident in a dues
8    provision designed to affect less than 2% of the membership, employed under
9    two CBAs, and yet ratified by international convention.

10        c.  In this case, as in *Patterson*, the members to be assessed voted
11    overwhelmingly against the dues, 22,897 "nays" to 1,375 "yeahs" – nearly 17:1.

12        d.  The revenue to be generated by § 32(f) was not earmarked for the
13    benefit of the class to be assessed, but for the AFM. The potential for
14    exploitation inheres in the payment of 100% of the revenue to AFM, with no
15    portion reserved for the local unions generating that revenue, and in the vesting
16    of discretion about how to allocate revenues entirely in AFM.

17        The factors relied upon by the court in *Mori* to uphold convention
18    ratification of a dues imposed on only one group of members all indicated that
19    the dues was designed to operate fairly, was not opposed by the assessed
20    minority group, and, as a practical matter, could not be ratified by only those
21    local unions actually affected. The record showed no evidence of an attempted
22    or actual abuse of union power. In this case, every one of the *Mori* factors
23    indicates an abuse of official power and an actual intent to abuse that power.
24    Unlike the dues reviewed in *Mori*, this dues provision easily could have been
25    ratified by the local unions where the members to be assessed were located –
26    where it would have been defeated, as shown by the actual convention vote.

27

28

1    The LMRDA was enacted for the purpose of protecting members against

2 just such abuses as are shown in the pleadings. Nothing in the caselaw,

3 including *Mori*, which itself expressly reaffirmed these statutory interests, stands

4 in the way of enforcing the statutory intent on the facts of this case. Under the

5 criteria identified in *Mori; Patterson*, and *Burroughs*, 686 F.2d at 730, which

6 remains the law of the Ninth Circuit and a leading interpretation of the

7 LMRDA's Bill of Rights for Union Members, § 32(f) was unlawfully ratified

8 by convention under § 101(a)(3).

9    **B.  *The Convention Ratified § 32(f) Without an Informed Vote.***

10    AFM wrongly argues that there is no right to informed voting under

11 section 101(a)(3). At least two federal circuits (the Sixth and Seventh) have

12 squarely so held, and the Ninth Circuit, in *Ackley v. Western Conference of*

13 *Teamsters,* 958 F.2d 1463 (1992), expressly confined the withdrawal of its

14 earlier recognition of an informed voting cause of action to such claims resting

15 on nonstatutory ratification rights. See n.7, below. The statutory right to ratify

16 all dues increases under § 101(a)(3) is the right to a "meaningful" vote. *Sertic,*

17 *supra.* The right to a meaningful vote under § 101(a)(3) is more than the mere

18 "naked right to cast a ballot," and must be informed. *Denov, supra.* In *Sertic,*

19 the Sixth Circuit court invalidated a dues increase because the referendum

20 ballot required members to respond with a single "Yes" or "No" to two

21 questions, denying their right to express separate views on each.[7]  AFM

22

_____

23    [7]  Most circuits, including the Ninth, extended the right to informed

24 voting to the nonstatutory ratification rights protected by section 101(a)(1)'s

"equal rights" provision. *See, e.g., Brown v. IBEW Local 58*, 936 F.2d 251,

25 354-55 (6th Cir. 1991); *Bunz v. Motion Picture Machine Operators*, 567 F.2d

26 1117 (D.C. Cir. 1977) (collecting cases). In *Ackley, supra,* the Ninth Circuit

retreated from the previously unquestioned assumption that all Title I

27

(continued...)

28

1  articulates no rationale for its position that members somehow lose their right

2  to informed voting on dues increases when they are required to exercise the

3  right through convention delegates.  If anything, the requirement for voting to

4  be informed should be enhanced at conventions, a context in which members

5  are compelled to delegate their right to vote on dues.

6          In this case, the ratification vote on section 32(f) was not informed,

7  because it was presented masquerading as a simple new application of "work

8  dues," although it was not a form of "work dues" as they were historically

9  known.  Previously, work dues had been a tax as a percentage of current

10  earnings.  This was an entirely new form of dues, and a radically different one,

11  which appears to be unprecedented.  It amounts to a wholesale redefinition of

12  the term "work dues" as set forth in the Bylaws at that time – without

13  proposed amendment.  Although the formula for computing benefit fund

14  distributions from supplemental market funds (SMFs) was "based on scale

15  earnings" – just as pension distributions are computed based on earnings, the

16  distributions themselves are not income directly attributable to work done by

17  each musician.[8]  Rather, this new dues is a tax on plan distributions generated

18

19  ──────────────────

20          [7](...continued)

21  ratification rights, whether statutory or nonstatutory, required informed voting.
   *Ackley* was expressly limited to cases in which "there is no statutorily created

22  right to vote on the subject at issue." *Id.* 1471. Since § 101(a)(3) establishes a

23  statutory voting right, this Court need not revisit *Ackley*.

24          [8]  SMF "special payments" are neither health nor retirement benefit
   payments.  However, taxation of dues on SMF payments would be little

25  different then taxation of dues on pension benefits, since such benefits, like

26  SMF payments, are also computed using formulas "based on earnings."
   Section 32(f) is precedent for involuntary lifetime monetary obligations to the

27  union.

28

1  by the employers' or third parties' conversion of the musician's impermanent
2  creative work into marketable commodities, namely, electronic media files.

3       Yet the new tax was presented to convention delegates as an uncontro-
4  versial form of "work dues." Since the overwhelming majority of delegates did
5  not perform work under the two targeted electronic media CBAs, they had no
6  way to assess AFM's mischaracterization of the proposed dues as "work dues."
7  The delegates ratified § 32(f) without knowing information that was crucial to
8  understanding it and how different it was from conventional "work dues."
9  AFM erroneously argues that section 32(f) assesses dues on scale earnings." It
10 is correct that the formula used to calculate SMF distributions uses a weighted
11 percentage taking into account the scale wages earned by each musician over
12 the last five years as related to the scale wages earned by all musicians. The
13 payment amount is computed in part by looking to the individual musician's
14 past scale earnings and in part by looking to all musicians' past scale earnings.
15 But it is only a formula for computing the payment amount. The payment
16 itself is a benefit fund payment, not scale earnings.

17      The term "work dues" was, and still is, defined in the Bylaws glossary
18 as a "percentage of scale wages earned." For all of the years after musicians
19 started receiving SMF payments until § 32(f) was implemented in the Fall
20 2008, work dues were assessed only as a percentage of scale wages earned,
21 leaving SMF distributions untaxed. Indeed, AFM took the position at the 2003
22 convention that the predecessor dues on SMF distributions could not properly
23 be placed in the Article 9 work dues provision. AC ¶¶ 81, 82. Placement of §
24 32(f) there in 2007 was contrary to AFM's position in 2003. While the
25 placement of § 32(f) in the Bylaws article on work dues did not by virtue of its
26 placement invalidate it, nothing on the face of § 32(f) flagged its radical
27 departure from the historical model for work dues. Its placement there, coupled
28

with AFM's failure to propose modification of the glossary definition of "work dues" or "scale," signified that § 32(f) fell within the historic "work dues" model – except to the few who actually knew what income it would tax.

By dressing § 32(f) in work dues clothing, AFM disguised its radical character as a tax on benefit fund distributions, rather than on scale earnings. Members deserved to have their delegates honestly informed as to the nature of this new dues, information that many of them presumably would have found to be a disturbing precedent.

Similarly, nothing on the face of the new provision provided notice that AFM intended to compute the 2% dues under § 32(f) without deducting from the SMF payment the portion calculated based on earnings for work done during the years before ratification. Delegates ratified § 32(f) without notice or reason to know that it would be applied to benefit payments on work done before § 32(f) became effective. Whether or not the dues as assessed were "retroactive," and therefore illegal, delegates were not informed that dues would be computed based on work performed before ratification. The delegates should have been so informed before voting, since many would consider such dues to be onerous and offensive, regardless of lawfulness.

Disclosure to delegates of both the unprecedented character of § 32(f) and AFM's intentions about how it would be computed were essential to a fair understanding of it. AFM's failure to disclose such information fatally tainted the ratification vote. That this is so is revealed by the surprisingly narrow margin by which § 32(f) was ratified, despite the fact that so few members would be burdened by it, the inflammatory arguments made by AFM in urging ratification, and AFM's failure to disclose how radical and onerous a tax it really was.

1          *C.  Arbitrary Enforcement of Section 32(f) Is Unlawful.*

2          Section 32(f) provided that "Federation Work Dues on payments to

3    musicians from supplemental market funds ... shall be 2% of the gross

4    distribution." The SRLA required SMF distributions to be paid annually.   There

5    was no discretion in the Employer's annual obligation to pay distributions or

6    the member's obligation to pay work dues.

7          Yet AFM has enforced § 32(f) as though vested with discretionary

8    enforcement powers.  It has made no effort to enforce the dues against retirees

9    or agency fee payers.  Nor has it attempted to enforce the dues against funds

10   paid under the film industry agreement.  Those members have instead been

11   invited to pay the dues on an honor system, no questions asked.  The *only*

12   membership sector against which AFM is enforcing the dues is the SRLA

13   membership in good standing.

14         Had § 32(f) expressly vested such arbitrary enforcement authority in

15   AFM, it would have been facially invalid.  *See; Wittstein, supra,* 379 U.S. at

16   180; *Burroughs, supra; Denov, supra,* 703 F.2d at 1040.  "Congress clearly did

17   not contemplate that a union membership could vote to increase its dues, ... and

18   have the union's officers put the increase into effect at any time that they

19   wanted to in the future." *Burroughs, supra,* 686 F.2d at 729.  In *Mori,* the

20   Ninth Circuit held that a dues increase was not unlawful under section

21   101(a)(3) for granting the union president discretion to suspend the dues for an

22   individual local union, where the international was not enriching itself at the

23   expense of unpopular locals. 653 F.2d at 1284. In *Burroughs,* one year later,

24   the same court invalidated a ratified dues increase granting the union

25   "discretion to waive all or part" of an automatic increase, because it "'in effect

26   repealed the (automatic) rate and substituted for it the power in the (union

27   management) to increase dues in any amount it might choose below a stated

28

-14-

1   maximum. Such a method of providing for a dues increase constitutes a
2   rate-fixing authority clearly contrary to the Act.'" *Id.* 729.  The arbitrariness of
3   AFM's enforcement of § 32(f) is remarkable, showing AFM's abdication of
4   accountability for enforcement as to film industry payments and no attempt at
5   enforcement against retirees or agency fee payers.

6       D. *Insofar as it Operates Retroactively, Bylaws § 32(f) Is a Void and*
7   *Unenforceable Retroactive Dues Assessment.*

8       By its own terms, § 32(f) is a prospective tax upon SPF payments, to be
9   assessed against work performed only after the September 2007 effective date
10  of § 32(f).  It does not claim retroactive effect and is capable of prospective
11  enforcement.[9]  Instead of giving § 32(f) prospective effect, AFM computed and
12  imposed the tax on the basis of the full SMF payments for 2007-2008, which at
13  that time <u>only</u> reflected scale earnings in the years before § 32(f)'s effective
14  date, thereby giving it retroactive effect. The dues should not have been levied,
15  and should not be levied until 2009, and then on 2009 work alone.  Not until
16  September 15, 2012, could there be a legitimate levy on the full SMF
17  payments, which reflect a weighted average of the past five years' earnings.

18      The general rule of statutory and contract interpretation prohibits retro-
19  active effect: "A statute imposing a new penalty or forfeiture, or a new
20  liability or disability, or creating a new right of action will not be construed as
21  having a retroactive effect...."   Llewellyn, *Remarks on the Theory of Appellate*
22  *Decision and the Rules or Canons about How Statutes are to be Construed,* 3
23  VAND. L. REV. 395 (1950).  The United States Supreme Court has described
24  "retroactive" statutes as those "which, though operating only from their passage,

25  _____

26      [9]  All that it required was to deduct from the sum on which it was to be
27  levied the portion attributable to earnings for work that predated the September
    15, 2007 effective date for the new dues.

28

1    affect vested  rights and past transactions." *Landgraf v. USI Film Products,*
2    511 U.S. 244, 271 (1994), and stated, "every statute, which takes away or
3    impairs vested rights acquired under existing laws, or creates a new obligation,
4    imposes a new duty, or attaches a new disability, in respect to transactions or
5    considerations already past, must be deemed retrospective...."  The Court went
6    on to state of such statutes, that the presumption against retroactivity "is deeply
7    rooted in our jurisprudence, and embodies a legal doctrine centuries older than
8    our Republic."– *Landgraf, supra,* 511 U.S. at 265-66.  "[T]he legal effect of
9    conduct should ordinarily be assessed under the law that existed when the
10   conduct took place."  *Id.*  "[C]ongressional enactments and administrative rules
11   will not be construed to have retroactive effect ***unless their language requires***
12   ***this result***." *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208
13   (1988) (emphasis added).  No such result is required here.
14       The same concern expressed by the Court in *Landgraf* about the
15   potential for abuse of power applies with even greater force to the power of
16   international unions over the economic lives of their members. Section
17   101(a)(3) has been repeatedly enforced by the courts as prohibiting retroactive
18   application in the sense defined by *Landgraf*, although, with the exception of
19   *Joinette v. Local 20, HMREB Union,* 106 Wash. 355, 722 P2d 83 (1986),[10] the
20   caselaw to date has addressed the issue only in the context of unions giving
21
22
23       [10] In *Joinette,* local union bylaws eliminated (or in some cases reduced)
     dues of "life members" on retirement.  The international union ratified a
24   provision rescinding the exception for retired members.  The retired members
     sued, on theories of breach of contract and promissory estoppel.  The court,
25   relying on Ninth Circuit precedent, refused to enforce the international union's
26   amendment, since the pre-amendment constitution had failed to provide
     members express notice that retired members were subject to future dues
27   increases.
28

1  retroactive effect to revotes held to remedy defective ratification procedures.
2  *See* Malin, *supra.*

3       There is no principled distinction between the well-settled rule that
4  unions cannot give retroactive effect to remedial dues votes and AFM's
5  retroactive computation of dues under § 32(f) to add a new tax layer to work
6  performed before the effective date.  The objection in each case is that the
7  membership (or its representatives) that ratified the dues was not the same
8  voting pool as the membership that performed the work subjected to retroactive
9  taxation.  It is not possible to know whether the membership pool existing
10 when the work was performed would have ratified it.  The voting pool that sent
11 delegates to the 2007 convention was as much as five years down the road
12 from the members and nonmembers affected by that vote.

13      Thus, the IRC rule that income is taxed by the rules in effect when the
14 payment is made cannot be applied to payments subjected to union dues subject
15 to prior membership ratification, without violating ratification rights.

16 <u>*Polone* has no Application to this Case</u>

17      This is the first reason that *Polone v. Commissioner,* 505 F.3d 966 (9th
18 Cir. 2007), an income tax case relied on by the AFM, therefore has no
19 application here.  AFM's "reach-back" application of § 32(f) violated statutory
20 ratification rights of members – those performing, in 2003, the work taxed
21 under § 32(f) in September 2008 – who left the union before the 2007
22 convention and thus had no opportunity to ratify the dues.  *Polone* involved a
23 single taxpayer, and that taxpayer had no right, ever, to vote against the tax
24 laws or IRS rules involved.

25      Second, as noted by the Court in Polone, the parties to the contract
26 knew that the payments were "subject to tax" because they were income, and
27 were simply exempted by a non-party (IRS) to the agreement.  In this case, no
28

1  one knew that SPF payments were "subject to tax."  Indeed, the <u>parties</u> all
2  agreed that the SPF payments were NOT subject to tax. They were specifically
3  defined by the parties not to be scale wages, which were the <u>only</u> payments
4  subject to tax.[10]

5       Third, in *Polone*, the Court stated emphatically that the federal income
6  tax rule is that income is taxed by the rules in effect when the payment is
7  made.  No such rule exists in federal labor law, and AFM has not cited one.
8  Indeed, in terms of the AFM (the <u>entity</u> purporting to make the change in the
9  "tax,") the long-time rule was that <u>only current earnings</u> (scale wages) were
10  subject to any dues or "tax."

11       Fourth, citing *Landgraf, supra,* the Court in *Polone* based its decision in
12  part on the argument that the change in the tax rates by the IRS did not impose
13  "new legal consequences to completed, past conduct."  *Id.* at 927.  In this case,
14  application of § 32(f) to current SMF payments to determine current dues
15  means that the scale work done in the past now has a "new legal consequence":
16  it determines how much Plaintiffs will pay in the future as "work dues."  The
17  more scale work in the past, the higher the dues.

18       AFM has cited no authority that the principle of income tax law
19  approved in *Polone* is found anywhere except the income tax laws and rules.
20  The LMRDA, unlike the IRC, is rooted in federal common law governing the
21  union-member relationship, including *Landgraf*, and "the historic equity powers
22  of the federal courts."  *Hall v. Cole*, 412 U.S. 1, 13-14 (1972) (holding that
23  plaintiffs whose successful litigation under LMRDA, Title I bestows a
24  "common benefit" upon the membership is entitled to recover attorney fees
25  under the historic equity powers of the federal courts and 29 U.S.C. § 412).
26  The Internal Revenue Code is no bedfellow to the common law.  In the area of
27  labor law, there are policy reasons unique to the history of labor-management
28

1 relations and labor-management legislation that govern how and why such

2 legislation is interpreted.  This history is completely different from the history

3 and policies regarding federal taxation, the Constitution, and federal tax

4 legislation. Cases addressing "retroactivity" in the area of federal taxation

5 cannot be imported wholesale into this arena as though they were authoritative.

6       This is an issue of first impression, in whcih *Landgraf* controls.  The

7 AFM bears the burden under the LMRDA of showing the lawfulness of

8 applying a rule of federal income tax to the federal common law that governs

9 this case. It has cited no authority, and there is none.

10       **E.  *Defendant has completely ignored the Fourth Claim for Relief.***

11       In the Fourth Claim for Relief, Plaintiffs plead the existence of a fully

12 completed, executed agreement/contract as to all work performed by each of

13 them prior to the enactment of Section 32(f).  First Amended Complaint, ¶¶

14 139-140.  They plead that as part of their compensation pursuant to such

15 agreement/contract, they earned the right to receive benefit payments from the

16 SLRA-SPF.    That is, "a deal is a deal."    However, Defendant wants to

17 change the deal.  **What Defendant is trying to do is no different that if it**

18 **said: "AFM is deciding to increase the work dues on work done in 2006,**

19 **and we are going to collect the increase this year."**

20       Once Plaintiffs paid their dues and did the work, Plaintiffs had fully

21 performed their part of the contract and earned the right to receive deferred

22 compensation payments (for the work done) from the SLRA-SPF for the next

23 five (5) years.  **Plaintiffs were not told, and had no reason to believe, that**

24 **future union membership might be withheld from them if they did not**

25 **agree to pay over to Defendant AFM a percentage of the future SPF**

26

27

28

1  **payments which they had just earned.**[11]  Yet this is precisely what is being

2  done.[12]  This clearly is contrary to the terms of the agreement/contract under

3  which the work was performed.

4        Defendant does not address the fact that this conduct violates the clear

5  agreement/contract under which the work was performed.  Instead, it attempts

6  to cast the claim as one for a breach of the Bylaws based solely on a claim of

7  impermissible "retroactivity."  In fact, the enactment of Section 32(f) <u>does</u>

8  constitute an attempt at a retroactive assessment.  *See* Section __ above.

9  However, it is more.  It is a breach of the agreement made between Plaintiffs

10 and Defendant at the time the work was done.

11       The agreement/contract in question as to work done in the past was

12 similar to, or in the nature of a unilateral contract; that is, one in which an

13

---

14       [11] That is, that they would have to pay "future work dues" on these SPF

15 payments (if they wanted to work), even though they had a right to the

16 payments completely independent of any such future work.  Further, the more

   they earned in the past, the more they would have to pay in work dues in the

17 future.

18       [12] By Defendant's own admission, members who work under the SLRA

19 get two (2) types of compensation for work done <u>at any one time</u>.  They

20 receive wages paid to them at the time they record, and deferred payments to

   them from the SRLA-SPF.  Moving Papers, at page 2, lines 11-18.  Defendant

21 ignores the fact that the evil of new Section 32(f) is that it treats the payment

22 from the SLRA-SPF as compensation earned <u>for current work</u>, instead of

   compensation already earned in the past for past work, and assesses work dues

23 on the deferred compensation from the past.

24       Further, AFM tells Plaintiffs: since you worked more in the past than

25 some members (i.e., got more scale wages), now you have to pay more this

   year for the right to work this year.

26

27

28

1  offer is accepted by performance. *See, e.g., Gadda v. State Bar,* 511 F.3d 933

2  (9th Cir. 2007). This contract could be, and as to each Plaintiff was, accepted

3  by performance by Plaintiff, in the form of paying the work dues and doing the

4  work. Once Plaintiff so performed, the agreement/contract became a binding

5  agreement, and Plaintiff's right to the SLRA-SPF payments in the future fully

6  vested. The agreement/contract did not contain any term which gave Defendant

7  AFM to subject such payments to work dues in the future.

8       **F.  *The Union Breached its Duty of Fair Representation and Violated***

9  ***Section 101(a)(3) by Steamrolling Over the Rights of a Minority Group of***

10  ***Members to Create a Predatory and Discriminatory Dues Provision.***

11       In its original brief, AFM argued, at 19, that "the duty of fair

12  representation does not encompass the entirety of a Union's interactions with its

13  members," a statement of law that Plaintiffs accept as correct. It is no longer

14  correct, however, after *Breininger v. Sheet Metal Workers Int'l. Ass'n.,* 493

15  U.S. 67 (1989), that plaintiffs must prove a violation of the CBA to establish a

16  DFR violation. "[A] suit against the union need not be accompanied by an

17  allegation that an employer breached the contract, since whatever the

18  employer's liability, the employee would still retain a legal claim [for breach of

19  the DFR] against the union." *Id.* 82-83. The DFR claims in this case are not

20  "hybrid" claims. Non-hybrid claims are independent of any breach of the

21  collective bargaining agreement. *Lewis v. Tuscan Dairy Farms, Inc.,* 25 F.3d

22  1138 (2d Cir. 1994).

23       The DFR limits aspects of the union-member relationship that implicate

24  the Union's role as the exclusive bargaining representative. *Breininger, supra,*

25  at 86-87. In *Breininger*, the union's misconduct in operating its hiring hall was

26  sufficient basis for a DFR claim, without regard to whether there were related

27  contract violations.

28

Internal union conflicts implicate the union's exclusive representational status when political influences taint representational decisions, and when this happens, the DFR applies. Union "steamrolling" of the weaker of two membership factions and violation of members' contract ratification rights to avoid a "no" vote "constitute[s] conduct which is 'arbitrary, discriminatory, or in bad faith' ... within the holding of *Vaca v. Sipes,* 386 U.S. 171, 190-93 (1967)." *Trail v. Teamsters*, 542 F.2d 961, 968 (6th Cir. 1976), *overruled on other grounds, Wooddell v. International Bhd. of Elec. Workers, Local 71,* 502 U.S. 93 (1991). Unions sometimes breach the DFR to enforce union security provisions of CBAs to compel payment of dues "for purposes that do not serve [members'] interests and in some cases are contrary to their personal beliefs." *Communications Workers of America v. Beck,* 487 U.S. 735, 743 (1988). Under these authorities, the DFR is breached if AFM exercises its contractual power to deny employment under the CBA for nonpayment of dues under a bylaws provision that it cannot lawfully enforce.

The dues obligation under § 32(f) may be controlled solely by the AFM Bylaws, but it is inextricably involved in AFM's status as exclusive bargaining representative. Under SRLA Art. 12(a), membership in good standing, which is determined by the payment of dues, fees, and assessments, is expressly made a condition of employment. Docket # 43-2, Exh. 1-1, at 4. Whether as an AFM member or agency fee payer, there is no way for a musician to continue to work under the SRLA without paying dues or their agency fee equivalents under Bylaws § 32(f).

AFM has the power to use its status as exclusive bargaining agent to enforce § 32(f), and thus there is a cause of action for DFR breach in AFM's adoption or enforcement of § 32(f). The amended complaint alleges in detail the crafting of § 32(f) so that it applied only to an ineffectually small group,

1  then steamrolling that small group by an international convention, for the
2  purpose of subjecting only that group to a heavy new dues, while exempting
3  the remaining 98.3% of the membership.  In addition, for the purpose of
4  inflaming delegates against the group in voting on § 32(f), AFM leaders made
5  hostile attacks against this small group, to which plaintiffs belong, calling them
6  greedy, selfish, and unduly wealthy, without acknowledging that the group's
7  local unions already carried on their backs more than 90% of the total
8  membership's dues burden.

9      Union leaders mischaracterized § 32(f) as "work dues" by classifying
10 them as work dues, an action it had decided just four years earlier was
11 impermissible, presumably because the SRLA expressly classified the income
12 on which the dues were to be assessed as payments "in addition to" scale
13 wages.

14     In enacting § 32(f), AFM imposed "work dues" on payments that were
15 expressly excluded from classification as "scale wages" under the SRLA.  This
16 action effectively reclassified SPF payments as "scale wage," in violation of the
17 SRLA.    Docket # 43-2, Exh. 1-1, art. 4, at 2; AC ¶¶ 22, 133.  While it is true
18 that the SRLA expressly eschewed any intent to interfere with the members'
19 obligations to AFM, Docket # 43-2, Art. 12(b), it is just as true that the same
20 document expressly forbade any changes to the Bylaws that "contravened"
21 provisions of the SRLA, *id.* Art. 13.

22     By the adoption of § 32(f), AFM unilaterally reclassified SPF payments
23 from a status under the SRLA that exempted them from work dues to a status
24 under the Bylaws that did not exempt them from work dues, erasing the CBA's
25 contractual distinction between "scale wages" and "the musicians' share of the
26 Sound Recording Special Payments Fund," without notice to convention
27 delegates or affording members their contract ratification rights under the
28

1 Bylaws on mid-term contract modifications of more than six months duration.

2 *See* AC ¶ 25.  It surely appears to have been an abuse of union power under

3 SRLA Article 12(b) to have reclassified contractual payments from a status

4 exempt from dues to a status subject to dues.

5    These are the sorts of action that have been held to violate the Union's

6 duty of fair representation.  As the Supreme Court has observed, the duty arises

7 from "the union's exclusive power to represent all employees in a particular

8 bargaining unit. It serves as a 'bulwark to prevent arbitrary union conduct

9 against individuals stripped of traditional forms of redress by the provisions of

10 federal labor law.'" *Breininger, supra,* at 86-87.  Defendant in this case abused

11 the power of the majority – *which was not affected in any way by the dues*

12 *increase* – to impose § 32(f) on a minority group, modifying the CBA that had

13 been approved by the Union's own mandatory ratification procedures and the

14 democratically expressed will of the small group of members actually affected

15 by its terms.  These members had ratified a contract that protected them against

16 such bullying by the majority.

17                    III.  CONCLUSION

18    For the foregoing reasons, Defendant AFM's motion to dismiss should be

19 denied.  Alternatively, the Court should grant the Plaintiffs leave to amend to

20 cure any defects in the complaint.

21 DATED:  October 13, 2009

22                    SAMUEL J. WELLS

23                    A Professional Corporation

24

25          By:          /S/
                    SAMUEL J. WELLS, Attorney for
26                  Plaintiffs  RAFAEL RISHIK, KEITH GREEN
                    AND STEPHEN J. ERDODY
27

28

                         -24-

# STATUTORY APPENDIX

LMRDA, section 101(a)(3), 29 U.S.C. § 411(a)(3):

**Dues, initiation fees, and assessments –**

Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization in effect on September 14, 1959 shall not be increased, and no general or special assessment shall be levied upon such members, except--

(A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot; or

(B) in the case of a labor organization, other than a local labor organization or a federation of national or international labor organizations, (i) by majority vote of the delegates voting at a regular convention, or at a special convention of such labor organization held upon not less than thirty days' written notice to the principal office of each local or constituent labor organization entitled to such notice, or (ii) by majority vote of the members in good standing of such labor organization voting in a membership referendum conducted by secret ballot, or (iii) by majority vote of the members of the executive board or similar governing body of such labor organization, pursuant to express authority contained in the constitution and bylaws of such labor organization: Provided, That such action on the part of the executive board or similar governing body shall be effective only until the next regular convention of such labor organization.